# EXHIBIT C

 Warning

As of: November 17, 2021 1:08 AM Z

## *Bindrim v. Mitchell*

Court of Appeal of California, Second Appellate District, Division Four

April 18, 1979

Civ. No. 52133

**Reporter**

92 Cal. App. 3d 61 *; 155 Cal. Rptr. 29 **; 1979 Cal. App. LEXIS 1655 ***; 5 Media L. Rep. 1113

PAUL BINDRIM, Plaintiff and Appellant, v. GWEN DAVIS MITCHELL et al., Defendants and Appellants

**Subsequent History:** [***1] A petition for a rehearing was denied May 7, 1979, and the opinion was modified to read as printed above.  Files, P. J., was of the opinion that the petition should be granted.  The petition of the defendants and appellants for a hearing by the Supreme Court was denied July 12, 1979.

**Prior History:** Superior Court of Los Angeles County, No. WE C 24045, Richard Leslie Wells, Judge.

**Disposition:** Otherwise the judgment is affirmed.  Neither party shall recover costs on appeal.

## Core Terms

libel, novel, nude, fictional, actual malice, therapy, encounter, marathon, defamatory, defamation, punitive damages, session, therapist, cases, damages, falsity, practices, attended, patient, majority opinion, identification, defendants', portrayal, publisher, public figure, investigate, fictitious, alleges, vulgar, clear and convincing evidence

## Case Summary

**Procedural Posture**

Defendant author and defendant publisher appealed from verdicts against them on plaintiff's libel and contract counts and from a judgment for damages in favor of plaintiff in the Superior Court of Los Angeles County (California).

**Overview**

Defendant author wrote a book about plaintiff's use of the so-called "Nude Marathon" in group therapy. As a participant, defendant author contractually agreed not to disclose what transpired. Following publication of defendant author's book about the sessions, plaintiff filed a defamation, libel, and breach of contract action, asserting that he was damaged by defendant author's inaccurate portrayal of what happened at the marathon. The court determined that there was clear and convincing evidence to support the libel claim and the jury's finding of actual malice against defendants author and publisher. The court affirmed the award of punitive damages against defendant publisher, finding it had a duty to investigate the possibility that plaintiff was defamed by the book. The court found no authority that plaintiff could contractually prevent defendant author from writing about her treatment; therefore, the limits to her right to report were those involved in the libel counts.

**Outcome**

The court affirmed the judgment but modified it by

92 Cal. App. 3d 61, *61; 155 Cal. Rptr. 29, **29; 1979 Cal. App. LEXIS 1655, ***1

substituting for separate judgments against defendants author and publisher a joint and several judgment against both defendants, and by including in the judgment a separate judgment against defendant publisher for punitive damages.

attitude toward the truth or falsity of the material published and reckless disregard of the truth or falsity cannot be fully encompassed by one infallible definition but its outer limits must be marked by a case-by-case adjudication.

# LexisNexis® Headnotes

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > Intentional Torts > Defamation > General Overview

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

*HN1*[⤓] Public Figures, Actual Malice

A public figure is precluded from recovering damages for a defamatory falsehood relating to him, unless he can prove that the statement was made with actual malice, that is, that it was made with knowledge that it is false or with reckless disregard of whether it was false or not.

Torts > Intentional Torts > Defamation > General Overview

*HN2*[⤓] Intentional Torts, Defamation

Reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Thus, what constitutes actual malice focuses on a defendant's

Constitutional Law > ... > Freedom of Speech > Defamation > Public Figures

Torts > ... > Defamation > Public Figures > Clear & Convincing Evidence

Civil Procedure > Appeals > Standards of Review > De Novo Review

Constitutional Law > ... > Freedom of Speech > Defamation > General Overview

Torts > Intentional Torts > Defamation > General Overview

Torts > Intentional Torts > Defamation > Libel

Torts > Intentional Torts > Defamation > Procedural Matters

Torts > ... > Defamation > Public Figures > Judicial Review

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

*HN3*[⤓] Defamation, Public Figures

Evidence establishing a reckless disregard for the truth must be clear and convincing evidence, and proof by a preponderance of evidence is insufficient. Whether or not such malice exists is a question of fact to be determined by the trier of fact. However, the reviewing court is required to review the evidence in a libel action by a public figure, to be sure that the principles were

constitutionally applied. The court has the duty to examine the record to determine whether it could constitutionally support a judgment in favor of plaintiff, but this does not involve a de novo review of the proceedings below wherein the jury's verdict is entitled to no weight.

Torts > Intentional Torts > Defamation > General Overview

*HN4*[↓]  **Intentional Torts, Defamation**

Courts require investigation as to truth or falsity of statements which were not hot news, but those cases involve factual stories about actual people.

Civil Procedure > Remedies > Damages > Punitive Damages

Torts > ... > Defamation > Remedies > Damages

Civil Procedure > Remedies > Damages > General Overview

Torts > Intentional Torts > Defamation > General Overview

Torts > Intentional Torts > Defamation > Libel

Torts > ... > Defamation > Public Figures > Actual Malice

Torts > ... > Defamation > Public Figures > Voluntary Public Figures

Torts > ... > Defamation > Remedies > General Overview

*HN5*[↓]  **Damages, Punitive Damages**

A public figure in a defamation case may be awarded

punitive damages when there is actual malice.

Torts > ... > Defamation > Defenses > Fair Comment & Opinion

Torts > Intentional Torts > Defamation > Libel

*HN6*[↓]  **Defenses, Fair Comment & Opinion**

There can be no libel predicated on an opinion. The publication must contain a false statement of fact.

Torts > ... > Defamation > Defenses > Exaggerations & Imaginative Commentary

Torts > Intentional Torts > Defamation > General Overview

Torts > ... > Defamation > Defenses > Fair Comment & Opinion

Torts > Intentional Torts > Defamation > Procedural Matters

*HN7*[↓]  **Defenses, Exaggerations & Imaginative Commentary**

An alleged defamatory statement may constitute a fact in one context and an opinion in another and content of the communication is taken as a whole.

Torts > ... > Defamation > Defenses > Fair Comment & Opinion

Torts > Intentional Torts > Defamation > General Overview

Torts > Intentional Torts > Defamation > Procedural Matters

*HN8*[⬇]   **Defenses, Fair Comment & Opinion**

Where the statements are unambiguously fact or opinion the court determines as a matter of law whether the statements are fact or opinion. However, where the alleged defamatory remarks could be determined either as fact or opinion, and the court cannot say as a matter of law that the statements were not understood as fact, there is a triable issue of fact for the jury.

Torts > Intentional Torts > Defamation > General Overview

*HN9*[⬇]   **Intentional Torts, Defamation**

The test is whether a reasonable person, reading a book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described. Each case must stand on its own facts.

Torts > Intentional Torts > Defamation > General Overview

*HN10*[⬇]   **Intentional Torts, Defamation**

Publication for purposes of defamation is sufficient when the publication is to only one person other than the person defamed.

Torts > Procedural Matters > Multiple Defendants > Distinct & Divisible Harms

Torts > Procedural Matters > Multiple Defendants > Joint & Several Liability

*HN11*[⬇]   **Multiple Defendants, Distinct & Divisible Harms**

Contributing wrongdoers, whether joint, concurrent or successive tortfeasors, are ordinarily jointly and severally liable for the entire damages.

Torts > Procedural Matters > Multiple Defendants > Distinct & Divisible Harms

*HN12*[⬇]   **Multiple Defendants, Distinct & Divisible Harms**

Courts resolve inconsistencies in damages awards by determining the jury's intention from an examination of the verdict. The appellate court will, if possible, make its own correction to uphold the verdict.

# Headnotes/Summary

### Summary

CALIFORNIA OFFICIAL REPORTS SUMMARY

In a libel action by a phycologist against a publisher and the author of a novel for libelous statements contained in the novel, the trial court entered a judgment for damages in favor of plaintiff. The court denied defendants' motion for judgment notwithstanding the verdict and granted a new trial subject to the conditions that a new trial would be denied if plaintiff consented to a reduction of the libel count against defendant author from $ 38,000 to $ 25,000, a striking of the $ 25,000 punitive damage award against the publisher on the libel count, and a striking of the $ 12,000 damage award on a contract count against the author. The record indicated plaintiff used a nude marathon group therapy technique to help people shed their phycological inhibitions with the removal of their clothes. Defendant author, an established writer, was allowed to enter the class as a participant after signing a written contract that she would not disclose what happened in the sessions. However, two months later she entered into a contract

92 Cal. App. 3d 61, *61; 155 Cal. Rptr. 29, **29; 1979 Cal. App. LEXIS 1655, ***1

with the publisher to write a novel based on the sessions and received advance royalties. After publication the hardback version of the novel, plaintiff sent letters to the publisher and author. Nine months later a different publishing company received authorization from defendant publisher to publish the book in paperback. The parallel between the actual nude marathon sessions and the sessions in the novel was shown to the jury by means of tape recordings plaintiff had taken of the actual sessions. In one such session plaintiff was depicted in the book as using obscene and unprofessional language which he did not in fact use. Plaintiff introduced expert testimony showing that the portrayal of him was injurious to his profession and that he was identified by certain colleagues as the supposed fictional character in the book. (Superior Court of Los Angeles County, No WE C 24045, Richard Leslie Well, Judge.)

The Court of Appeal modified the judgment, as already modified in the motion for a new trial, by substituting for separate judgments against defendants author and publisher a joint and several judgment against both defendants in the amount of $ 50,000, and by including in the judgment a separate judgment against the publisher of $ 25,000 for punitive damages. The court affirmed the judgment as modified. The court held that there was clear and convincing evidence to support the jury's finding that the defendant author entertained actual malice against plaintiff, a public figure, and that defendant publisher had actual malice when it permitted the paperback printing of the novel, although there was no actual malice on the part of the publisher in its original printing of the hardback edition. Furthermore, the court held that since there was actual malice shown against the publisher, the award of punitive damages was proper. Also, the court held that there was sufficient evidence that plaintiff and the supposed fictional character in the novel were one and the same. The

court next held that it was clear from the transcript of an actual encounter session that some of the incidents portrayed by the author were false and cast plaintiff in a disparaging light. The court also held that defendant author and publisher were joint tortfeasors. Finally the court held that the trial court properly struck the damage award on the contract count, since a professional person cannot, by contract, or otherwise, prevent one of his patients from reporting the treatment that patient received. (Opinion by Kingsley, J. Separate concurring opinion by Jefferson (Bernard), J., Separate dissenting opinion by Files, P.J.)

## Headnotes

### CALIFORNIA OFFICIAL REPORTS HEADNOTES

Classified to California Digest of Official Reports, 3d Series

*CA(1)* (1)

**Libel and Slander § 26—Privileged Communications—Qualified Privilege—Public Figures.**

--A public figure is precluded from recovering damages for a defamatory falsehood relating to him, unless he proves that the statement was made with actual malice, that is, that it was made with knowledge that it was false or with reckless disregard of whether it was false or not. Reckless disregard is not measured by whether a reasonably prudent man would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Thus, what constitutes actual malice focuses on defendant's attitude toward the truth or falsity of the material published, and reckless disregard of the truth or falsity cannot be fully encompassed by one infallible definition but its outer limits must be marked by a case-by-case adjudication.

[See **Cal.Jur.3d**, Assault and Other Wilful Torts, § *146; Am.Jur.2d, Libel and Slander, § 301*.]

*CA(2)*[⬇] (2)

**Libel and Slander § 48—Actions—Evidence—Weight and Sufficiency—Malice—Public Figures.**

--Evidence establishing a reckless disregard for the truth in an alleged defamatory statement against a public figure must be clear and convincing evidence, and proof by a preponderance of evidence is sufficient. Whether or not there was such malice is a question of fact to be determined by the trier of fact.

*CA(3)*[⬇] (3)

**Libel and Slander § 57—Actions—Libel Action by Public Figure.**

--On review of a libel action by a public figure, the appellate court is required to review the evidence to be sure that the principles of libel actions were constitutionally applied. The court has the duty to examine the record to determine whether it could constitutionally support a judgment in favor of plaintiff, but this does not involve a de novo review of the proceedings below wherein the jury's verdict is entitled to no weight.

*CA(4)*[⬇] (4)

**Libel and Slander § 48—Action—Evidence—Weight an Sufficiency—Malice—Public Figures—Malice by Author.**

--There was clear and convincing evidence to support the jury's finding, in a libel action by a phycologist a public figure, against the author of a novel which depicted his nude marathon group therapy sessions, that defendant author's publication was in reckless disregard of the truth or with actual knowledge of falsity constituting actual malice. The record indicated the author had enrolled in the sessions and had attended them, and thus there could be no suggestion that she did not know the true facts.

*CA(5)*[⬇] (5)

**Libel and Slander § 48—Actions—Evidence-Weight and Sufficiency—Malice—Public Figures—Publisher of Hardback Novel.**

--Plaintiff, a psychologist and public figure, failed to prove by clear and convincing evidence, in his libel action against a publisher of a novel, that the original hardback edition of the novel, depicting plaintiff's nude marathon encounter therapy sessions, was made with knowledge of falsity or in reckless disregard of falsity constituting actual malice. The record indicated an editor with defendant had cautioned the author of the novel that the characters must be totally fictitious, and the author assured him that the characters in the novel were incapable of being identified as real persons. Also, the editor arranged to have the manuscript read by another editor knowledgeable in the field of libel.

*CA(6)*[⬇] (6)

**Libel and Slander § 48—Actions—Evidence—Weight and Sufficiency—Malice—Public Figure—Publisher of Hardback Novel—Duty to Investigate.**

--In cases involving actual stories about actual people, publishers are required to investigate as the the truth or falsity of statements which are not hot news. However, where the publication comes from a known reliable source and there is nothing in the circumstances to suggest inaccuracy, there is no duty to investigate. Thus, there was nothing in the record of plaintiff's libel action against the publisher of the original hardback

92 Cal. App. 3d 61, *61; 155 Cal. Rptr. 29, **29; 1979 Cal. App. LEXIS 1655, ***1

edition of a novel depicting plaintiff's nude marathon encounter therapy sessions, to suggest that, prior to the hardback printing defendant in fact entertained serious doubts as to the truth or falsity of the publications in the novel, and the failure of the publisher to investigate was not sufficient to show actual malice. The record indicated that plaintiff was a psychologist and public figure, that the publisher had been assured by the author that no actual, identifiable person was involved in the novel, and that all the characters were fictitious.

## CA(7)[⬇] (7)

**Libel and Slander § 48—Actions—Evidence—Weight and Sufficiency—Malice—Public Figure—Publisher of Paperback Edition of Novel—Duty to Investigate.**

-- There was sufficient evidence in an action by a psychologist and public figure for libel against the publisher, who allowed the publication in paperback of a novel depicting plaintiff's nude marathon encounter therapy sessions, to establish actual malice on the part of the publisher. The record indicated the publisher had allowed the printing of the paperback after receiving a letter from plaintiff's attorney explaining that plaintiff was one and the same with the supposed fictional character in the novel. Although, after the receipt of the letter from plaintiff's attorney, the publisher inquired of the author as to whether plaintiff was the character in the book and received assurances that plaintiff was not the character in the book, the publisher had some further duty to investigate.

## CA(8)[⬇] (8)

**Libel and Slander § 31—Damages—Exemplary or Punitive Damages—Actual Malice.**

--A public figure in a defamation case may be awarded punitive damages when there is actual malice shown.

Thus, in a libel action by a psychologist and public figure against a publisher for the publication of a novel containing accounts libelous of plaintiff, the trial court erroneously struck the award of punitive damages by the jury against the publisher on the ground that the jury did not award punitive damages against the author of the novel who was also a defendant in the case. The record indicated actual malice was established against the publisher.

## CA(9)[⬇] (9)

**Libel and Slander § 31—Damages—Exemplary or Punitive Damages—Actual Malice—Multiple Defendants.**

--Punitive damages are discretionary, and wealth may be taken into account, thus making it proper for a jury to award punitive damages only against one defendant and not against the other. Thus, in a libel action by a psychologist and public figure against the author of a novel and publisher of the novel, it was proper for the jury to award punitive damages only against the publisher, even though the record established actual malice by both the author and the publisher, indicating that punitive damages could have been awarded against both defendants.

## CA(10)[⬇] (10)

**Libel and Slander § 47—Actions—Evidence—Weight and Sufficiency—Novel—Relation Between Fictional Character and Plaintiff.**

--In a libel action by a psychologist and public figure against the author and publisher of a novel depicting plaintiff's nude marathon encounter therapy sessions, there was sufficient evidence to show that plaintiff was identified as a character in the novel. The record indicated the only differences between plaintiff and the character in the novel were physical appearance and

the fact that the character in the novel was a psychiatrist rather than a psychologist. Otherwise, the character was very similar to plaintiff. Furthermore, plaintiff was identified as the character by several witnesses, and plaintiff's own tape recordings of the marathon sessions showed that the novel was based substantially on his conduct in the sessions.

## *CA(11)*[⬇] (11)

**Libel and Slander § 3—Elements of Defamation—False Statement of Fact.**

--There can be no libel predicated on an opinion. Rather, the publication must contain a false statement of fact.

## *CA(12)*[⬇] (12)

**Libel and Slander § 47—Actions—Evidence—Weight and Sufficiency—False Statement of Fact.**

--In a libel action by a psychologist against the author and publisher of a novel depicting his nude marathon encounter therapy sessions, there was sufficient evidence to show that the novel contained false statements of fact. The record indicated that transcripts of the actual encounter sessions showed that some of the incidents portrayed in the novel by the author were false, that is, a substantially inaccurate description of what actually happened. The transcripts also showed that some of these portrayals cast plaintiff in a disparaging light depicting his language and conduct as crude, aggressive and unprofessional.

## *CA(13)*[⬇] (13)

**Libel and Slander § 3—Elements of Defamation—Novel—Fictional Characters.**

--The test in a libel action stemming from statements made in a novel is whether a reasonable person, reading the book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described. Each case must stand on its own facts.

## *CA(14)*[⬇] (14)

**Libel and Slander § 3—Elemendts of Defamation—Publication to Other People.**

--Publication for purposes of defamation is sufficient when the publication is to only one person other than the person defamed.

## *CA(15)*[⬇] (15)

**Libel and Slander § 52—Actions—Instructions—Privilege and Malice.**

--The clear and convincing evidence standard applies, in libel action, to the proving that the libelous act was done with actual malice. Thus, in a libel action by a psychologist and public figure against the publisher of a novel containing allegedly libelous statements, the trial court did not err in rejecting defendant's instruction that plaintiff must prove by clear and convincing evidence that defendants intentionally identified him as a character in the novel. The record indicated that the trial court had given an instruction to the jury concerning the fact that the clear and convincing evidence standard applied to proving that the libelous statements were made with actual malice.

## *CA(16)*[⬇] (16)

**Libel and Slander § 51—Actions—Instructions—Publication.**

--For the tort of defamation, publication to simply one

92 Cal. App. 3d 61, *61; 155 Cal. Rptr. 29, **29; 1979 Cal. App. LEXIS 1655, ***1

person other than the person defamed is sufficient. Thus, in an action for libel by a psychologist against the publisher of a novel in which plaintiff is depicted as a supposedly fictional character, the trial court properly refused defendants' requested instruction that the jury must find that a substantial segment of the public did, in fact, believe that the character in the novel was, in fact, plaintiff.

## CA(17)[⬇] (17)

**Libel and Slander § 51—Actions—Instructions—Libelous Statements.**

--In an action by a psychologist against the publisher of a novel containing allegedly libelous statements, the trial court did not fail to instruct the jury that it could only assess liability if it determined that the challenged statements in the novel were libelous. The record indicated the court instructed the jury that in order to recover for libel, plaintiff must prove that a statement in the novel was reasonably susceptible of a libelous interpretation. The court further instructed the jury that in making its determination it should consider the novel as a whole, and that is should construe the words according to the fair and natural meaning that would be given them by reasonable persons of ordinary intelligence.

## CA(18)[⬇] (18)

**Libel and Slander § 46—Actions—Evidence—Admissibiltiy—Evidence Identifying Plaintiff as Supposed Fictional Character in Novel.**

--In a libel action by a psychologist and public figure against the author of a novel depicting plaintiff's marathon nude encounter therapy sessions, the trial court properly allowed one of plaintiff's identification witnesses to testify that a psychologist who was familiar

with nudity and psychotherapy literature would be able to recognize a supposed fictional character in the novel as plaintiff, and that someone who did not know plaintiff personally but was familiar with the literature would recognize plaintiff in the novel. The record indicated there was other evidence of identification by two other witnesses, and that the witness himself identified plaintiff as the supposed fictional character in the novel through knowledge of plaintiff's work and through the character's style of talking to people in the novel.

## CA(19)[⬇] (19)

**Contribution and Indemnification § 3—Contribution—Joint Tortfeasors—Joint and Several Liability.**

--Contributing wrongdoers, whether joint, concurrent or successive tortfeasors, are ordinarily jointly and severally liable for the entire damage. When they are joined in an action it is improper to apportion compensating damage among them, and judgment for the full amount should be rendered against each. Courts must resolve inconsistencies by the determination of the jury's intention from an examination of the verdict. An appellate court must, if possible, make its own correction to uphold the verdict.

## CA(20)[⬇] (20)

**Healing Arts and Institutions § 27—Physiucians, Surgeons and Other Medical Practitioners—Relationship With Patients—Right of Patient to Report Treatment.**

--A professional person cannot, by contract or otherwise, prevent one of his patients from reporting the treatment that he received. Thus, in a libel and breach of contract action by a psychologist against a patient who later wrote a novel depicting the events in plaintiff's nude marathon encounter therapy sessions, the trial court properly struck the jury's damage award against

92 Cal. App. 3d 61, *61; 155 Cal. Rptr. 29, **29; 1979 Cal. App. LEXIS 1655, ***1

defendant on the contract count. The record indicated the whole theory of plaintiff's therapy was that of group encounter, and that what defendant saw done to and by other members of the group was part of her own treatment, and she was free to report it.

*CA(21)*[⬇] (21)

Libel and Slander § 32—Damages—Amount—Compensatory Damages.

--In a libel action by a psychologist against the author of a novel depicting plaintiff's nude marathon encounter therapy sessions, the trial court properly reduced the jury's verdict against defendant from $ 38,000 to $ 25,000 on the ground that there was no evidence that the publication of the libel to an acquaintance of defendant's, in addition to the libelous statements in the novel, caused any damage. The record indicated that the acquaintance was fully aware of what actually happened at the nude marathon sessions, and that plaintiff could not have been damaged by any publication to her.

**Counsel:** Lillick, McHose & Charles, Anthony Liebig, Kathleen Hallberg, Satterlee & Stephens, Robert M. Callagy and Katherine J. Trager for Defendants and Appellants.

Slaff, Mosk & Rudman, George Slaff and Marc R. Stein for Plaintiff and Appellant.

**Judges:** Opinion by Kingsley, J.  Separate concurring opinion by Jefferson (Bernard), J.  Separate dissenting opinion by Files, P. J.

**Opinion by:** KINGSLEY

# Opinion

 [*68] [**33]  This is an appeal taken by Doubleday and Gwen Davis Mitchell from a judgment for damages in favor of plaintiff-respondent Paul Bindrim, Ph.D.   The jury returned verdicts on the libel counts against Doubleday and Mitchell and on the contract count against Mitchell.

 [*69]  The court denied defendants' motion for [***2] judgment NOV and granted a new trial subject to the condition that new trial would be denied if plaintiff would consent to (1) a reduction of the libel verdict against Mitchell from $ 38,000 to $ 25,000; (2) a striking of the $ 25,000 punitive damage award against Doubleday on the libel count; and (3) a striking of the $ 12,000 damage award on the contract count against Mitchell.

Plaintiff consented without prejudice on these issues in any appeal to be taken from the judgment.  Defendants appealed and plaintiff cross-appealed from the judgment reducing the original jury verdict.

Plaintiff is a licensed clinical psychologist and defendant is an author.   Plaintiff used the so-called "Nude Marathon" in group therapy as a means of helping people to shed their psychological inhibitions with the removal of their clothes.

Defendant Mitchell had written a successful best seller in 1969 and had set out to write a novel about women of the leisure class.   Mitchell attempted to register in plaintiff's nude therapy but he told her he would not permit her to do so if she was going to write about it in a novel. Plaintiff said she was attending the marathon solely for therapeutic reasons and had [***3] no intention of writing about the nude marathon. Plaintiff brought to Mitchell's attention paragraph B of the written contract which reads as follows: "The participant agrees that he will not take photographs, write articles, or in any manner disclose who has attended the workshop or what has transpired.  If he fails to do so he releases all

92 Cal. App. 3d 61, *69; 155 Cal. Rptr. 29, **33; 1979 Cal. App. LEXIS 1655, ***3

parties from this contract, but remains legally liable for damages sustained by the leaders and participants."

Mitchell reassured plaintiff again she would not write about the session, she paid her money and the next day she executed the agreement and attended the nude marathon.

Mitchell entered into a contract with Doubleday two months later and was to receive $ 150,000 advance royalties for her novel.

Mitchell met Eleanor Hoover for lunch and said she was worried because she had [**34] signed a contract and painted a devastating portrait of Bindrim.

Mitchell told Doubleday executive McCormick that she had attended a marathon session and it was quite a psychological jolt. The novel was [*70] published under the name "Touching" and it depicted a nude encounter session in Southern California led by "Dr. Simon Herford."

Plaintiff [***4] first saw the book after its publication and his attorneys sent letters to Doubleday and Mitchell. Nine months later the New American Library published the book in paperback.

The parallel between the actual nude marathon sessions and the sessions in the book "Touching" was shown to the jury by means of the tape recordings Bindrim had taken of the actual sessions. Plaintiff complains in particular about a portrayed session in which he tried to encourage a minister to get his wife to attend the nude marathon. Plaintiff alleges he was libeled by the passage below:

*Excerpts from "Touching"*

*Page*

126-27

The minister was telling us how the experience had gotten him further back to God,

And all the time he was getting closer to God, he was being moved further away from his wife, who didn't understand, she didn't understand at all. She didn't realize what was coming out of the sensitivity training sessions he was conducting in the church.

he felt, he, more than felt, he knew, that if she didn't begin coming to the nude marathons and try to grasp what it was all about, the marriage would be over.

"You better bring her to the next marathon," Simon said.

"I've been trying," [***5] said the minister. "I only pray she comes."

"You better do better than pray," said Simon. "You better grab her by the cunt and drag her here."

"I can only try."

"You can do more than try. You can grab her by the cunt,

"A man with that kind of power, whether it comes from God or from his own manly strength, strength he doesn't know he has, can drag his wife here by the fucking cunt.

"I know," Alex said softly. "I know."

*Transcript of Actual Session*

"I've come a little way,"

"I'd like to know about your wife. She hasn't been to a marathon?"

"No."

"Isn't interested? Has no need?"

"I don't - she did finally say that she would like to go to a

standard sensitivity training session somewhere.  She would be - I can't imagine her in a nude marathon. She can't imagine it."

"Why?"

"Neither could I when I first came.

"Yeh.  She might.  I don't know."

"It certainly would be a good idea for two reasons: one, the minor one is that you are involved here, and if she were in the same thing, and you could come to some of the couple ones, it would be helpful to you.  But more than that, almost a definite recipe for breaking up a marriage is for one person to go into growth groups **[***6]** and sense change and grow . . ."

"I know that."

"Boy they sure don't want that, and once they're clear they don't need that mate anymore, and they are not very patient."

"But it is true, the more I get open the more the walls are built between us.  And it's becoming a fairly intelligent place, a fairly open place, doing moderate sensitivity eyeballing stuff with the kids.  I use some of these techniques teaching out class work."

"Becoming more involved?"

"Yeh, involved at the same time that I am more separated from.  It's a paradox again, isn't it?"

"Mmm."

 **[*71]** **[**35]**  Plaintiff asserts that he was libeled by the suggestion that he used obscene language which he did not in fact use.  Plaintiff also alleges various other libels due to Mitchell's inaccurate portrayal of what actually happened at the marathon. Plaintiff alleges that he was injured in his profession and expert testimony was

introduced showing that Mitchell's portrayal of plaintiff was injurious and that plaintiff was identified by certain colleagues as the character in the book, Simon Herford.

I

Defendants first allege that they were entitled to judgment on the ground that there was no showing of "actual **[***7]**  malice" by defendants.   *CA(1)*[⬆] (1) *HN1*[⬆] ] As a public figure, [1] plaintiff is precluded from recovering **[72]** damages for a defamatory falsehood relating to him, unless he proved that the statement was made with "actual malice," that is, that it was made with knowledge that it is false or with reckless disregard of whether it was false or not.  ( *New York Times Co. v. Sullivan (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412].*) The cases are clear that *HN2*[⬆] ] reckless conduct is not measured by whether a reasonably prudent man would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  ( *St. Amant v. Thompson (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].*) Thus, what constitutes actual malice focuses on defendants' attitude toward the truth or falsity of the material published and reckless disregard of the truth or falsity cannot be fully encompassed by one infallible definition but its outer limits must be marked by a case-by-case adjudication.  ( *Widener v. Pacific Gas & Electric Co. (1977)  [***8]  75 Cal.App.3d 415, 434 [142 Cal.Rptr. 304].*)

*CA(2)*[⬆] (2) *HN3*[⬆] ] Evidence establishing a reckless disregard for the truth must be clear and convincing evidence, and proof by a preponderance of evidence is insufficient.  ( *New York Times Co. v. Sullivan (1964)*

_____

[1] Plaintiff admits, and the evidence shows, that he is a public figure.

*supra, 376 U.S. 254, at pp. 285-286 [11 L.Ed.2d 686, at pp. 709-710].*) Whether or not there was such malice is a question of fact to be determined by the trier of fact. ( *Widener v. Pacific Gas & Electric Co. (1977) supra, 75 Cal.App.3d 415.*) *CA(3)*[↑] **(3)** However, the reviewing court is required to review the evidence in a libel action by a public figure, to be sure that the principles were constitutionally applied. ( *Montandon v. Triangle Publications, Inc. (1975) 45 Cal.App.3d 938, 948 [120 Cal.Rptr. 186, 84 A.L.R.3d 1234].*) The court has the duty to examine the record to determine whether it could constitutionally support a judgment in favor of plaintiff, but this does not involve [***9] a de novo review of the proceedings below wherein the jury's verdict is entitled to no weight. ( *Widener v. Pacific Gas & Electric Co. (1977) supra, 75 Cal.App.3d at p. 433.*)

*CA(4)*[↑] **(4)** There is clear and convincing evidence to support the jury's finding that defendant Mitchell entertained actual malice, and that defendant Doubleday had actual malice when it permitted the paperback printing of "Touching," although there was no actual malice on the part of Doubleday in its original printing of the hardback edition.

Mitchell's reckless disregard for the truth was apparent from her knowledge of the truth of what transpired at the encounter, and the **[*73]** literary portrayals of that encounter. [2] Since she attended sessions, there can be no suggestion that she did not know the true facts. Since "actual malice" concentrates solely on defendants' attitude toward the truth or falsity of the material published ( *Carson v. Allied News Co. (7th Cir. 1976) 529 F.2d 206*; *Widener* v. *Pacific Gas & Electric Co.* (1977), *supra, 75 Cal.App.3d 415*, **[**36]** and not on

malicious motives, [3] certainly defendant Mitchell was in a position to know the truth or falsity of her **[***10]** own material, and the jury was entitled to find that her publication was in reckless disregard of that truth or with actual knowledge of falsity.

*CA(5)*[↑] **(5)** However, plaintiff failed to prove by clear and convincing evidence that the original hardback publication by Doubleday was made with knowledge of falsity or in reckless disregard of falsity. McCormick of Doubleday cautioned plaintiff that the characters must be totally fictitious and Mitchell assured McCormick that the characters in "Touching" were incapable of being identified as real persons. McCormick arranged to have the manuscript read by an editor knowledgeable in the field of libel. The cases are clear that reckless conduct is not measured by whether a reasonably prudent **[***11]** person would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that defendant in fact entertained serious doubts as to the truth of his publication, ( *St. Amant v. Thompson (1968) supra, 390 U.S. 727, 731 [20 L.Ed.2d 262, 267]*), and there is nothing to suggest that Doubleday entertained such doubts prior to the hardback publication.

*CA(6)*[↑] **(6)** Plaintiff suggests that, since the book did not involve "hot news," Doubleday had a duty to investigate the content for truth. *HN4*[↑] Courts have required investigation as to truth or falsity of statements which were not hot news ( *Widener v. Pacific Gas & Electric Co. (1977) supra, 75 Cal.App.3d 415*, *Carson v. Allied News Co. (3d Cir. 1976) supra, 529 F.2d 206*), but those cases involved factual stories about actual people. In the case at bar, Doubleday had been

---

[2] The fact that "Touching" was a novel does not necessarily insulate Mitchell from liability for libel, if all the elements of libel are otherwise present.

[3] There is no suggestion that Mitchell was being malicious in the fabrication; her intent may have been to be colorful or dramatic.

92 Cal. App. 3d 61, *73; 155 Cal. Rptr. 29, **36; 1979 Cal. App. LEXIS 1655, ***11

assured by Mitchell that no actual, identifiable person was involved and that all the characters were fictitious in the novel. Where the publication comes from a known reliable source and there is nothing in the circumstances to suggest inaccuracy, there is no duty to investigate. (See *Baldine [***12] v. Sharon Herald Co. (3d Cir. 1968) 391 F.2d 703, 707*.) There was nothing in the record to suggest that, prior **[*74]** to the hardback printing, defendant Doubleday in fact entertained serious doubts as to the truth or falsity of the publication, and investigatory failure alone is insufficient to find actual malice.

*CA(7)*[⬆] ] **(7)** However, prior to the paperback printing there were surrounding circumstances to suggest inaccuracy, such that at that point Doubleday had a duty to investigate. Plaintiff did show that Doubleday sold the rights to the New American Library after receiving a letter from plaintiff's attorney explaining that plaintiff was Herford and the inscription in the paperback said, "This is an authorized edition published by Doubleday and Company." Although, after the receipt of the plaintiff's attorney's letter, Doubleday again inquired of Mitchell as to whether plaintiff was the character in the book, the jury was entitled to find that Mitchell's assurance to Doubleday was not sufficient to insulate Doubleday from liability and that Doubleday had some further duty to investigate. The jury could have inferred that at that point Doubleday either had serious doubts, or should **[***13]** have had serious doubts, as to the possibility that plaintiff was defamed by "Touching" and that at that point Doubleday had some duty to investigate. [4]

─────────────

[4] Note: This paperback edition was published by New Amercian Library, not by Doubleday, but was apparently published with Doubleday's permission. The parties do not raise the issue of whether Doubleday's "permission," i.e., whether Doubleday's "causing" the book to be published by

**II**

*CA(8)*[⬆] ] **(8)** For similar reasons, the award for punitive damages against Doubleday may *HN5*[⬆] ] stand. A public figure in a defamation case may be awarded punitive damages **[**37]** when there is "actual malice" under the *New York Times* standard ( *Maheu v. Hughes Tool Co. (9th Cir. 1977) 569 F.2d 459*), and, as we have said above, actual malice was established for Doubleday. The trial court below erroneously struck the award of punitive damages against Doubleday, on the ground that the jury did not award **[***14]** even token punitive damages against Mitchell although she had $ 165,000 in community property. The judge reasoned that the jury apparently found no fault or "malice attributable to her." However, the jury must have found that Mrs. Mitchell had "actual malice" to have awarded even compensatory damages against her. And the standard for punitive damages for libel of a public figure is "actual malice," under the *New York Times* case, not hatred. *CA(9)*[⬆] ] **(9)** Since all that is required for punitive damages of a public figure is actual malice and not hatred (see *Maheu v. Hughes Tool Co., supra*), and since both Doubleday and Mitchell had **[*75]** "actual malice," it follows that punitive damages *could* have been awarded against both defendants. But since punitive damages are discretionary and wealth may be taken into account (see *Sandoval v. Southern Cal. Enterprises, Inc. (1950) 98 Cal.App.2d 240, 250 [219 P.2d 928]*), it was proper to award punitive damages only against one defendant, and not the other.

**III**

*CA(10)*[⬆] ] **(10)** Appellants claim that, even if there are untrue statements, there is no showing that plaintiff was identified as the character, Simon Herford, in the novel

─────────────

another company, is actually a "publication" for purposes of libel, by Doubleday.

"Touching."

 [***15]  Appellants allege that plaintiff failed to show he was identifiable as Simon Herford, relying on the fact that the character in "Touching" was described in the book as a "fat Santa Claus type with long white hair, white sideburns, a cherubic rosy face and rosy forearms" and that Bindrim was clean shaven and had short hair.  Defendants rely in part on *Wheeler v. Dell Publishing Co. (7th Cir. 1962) 300 F.2d 372*, which involved an alleged libel caused by a fictional account of an actual murder trial.  The *Wheeler* court said (at p. 376): "In our opinion, any reasonable person who read the book and was in a position to identify Hazel Wheeler with Janice Quill would more likely conclude that the author created the latter in an ugly way so that none would identify her with Hazel Wheeler.  It is important to note that while the trial and locale might suggest Hazel Wheeler to those who knew the Chenoweth family, suggestion is not identification. In *Levy* [*Levy v. Warner Bros. Pictures (S.D.N.Y. 1944) 57 F.Supp. 40*] the court said those who had seen her act may have been reminded of her by songs and scenes, but would not reasonably identify her." However, in *Wheeler* [***16] the court found that no one who knew the real widow could possibly identify her with the character in the novel. In the case at bar, the only differences between plaintiff and the Herford character in "Touching" were physical appearance and that Herford was a psychiatrist rather than psychologist. Otherwise, the character Simon Herford was very similar to the actual plaintiff. We cannot say, as did the court in *Wheeler*, that no one who knew plaintiff Bindrim could reasonably identify him with the fictional character.  Plaintiff was identified as Herford by several witnesses and plaintiff's own tape recordings of the marathon sessions show that the novel was based substantially on plaintiff's conduct in the nude marathon.

 [*76]  Defendant also relies on *Middlebrooks v. Curtis Publishing Co. (4th Cir. 1969) 413 F.2d 141*, where the marked dissimilarities between the fictional character and the plaintiff supported the court's finding against the reasonableness of identification. In *Middlebrooks*, there was a difference in age, an absence from the locale at the time of the episode, and a difference in employment of the fictional character and plaintiff; nor did the [***17] story parallel the plaintiff's life in any significant manner. In the case at bar, apart from some of those episodes allegedly constituting the libelous matter itself, and apart from the physical difference and the fact that plaintiff had a Ph.D., and not an M.D., the similarities between Herford and Bindrim are clear, and the transcripts of [**38] the actual encounter weekend show a close parallel between the narrative of plaintiff's novel and the actual real life events.  Here, there were many similarities between the character, Herford, and the plaintiff Bindrim and those few differences do not bring the case under the rule of *Middlebrooks*.  (See *Fetler v. Houghton Mifflin Co. (2d Cir. 1966) 364 F.2d 650*.) There is overwhelming evidence that plaintiff and "Herford" were one.

IV

However, even though there was clear and convincing evidence to support the finding of "actual malice," and even though there was support for finding that plaintiff is identified as the character in Mitchell's novel, there still can be no recovery by plaintiff if the statements in "Touching" were not libelous. *CA(11)* [⬆] (11) *HN6* [⬆] There can be no libel predicated on an opinion.  The publication must contain [***18] a false statement of fact. ( *Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596 [131 Cal.Rptr. 641, 552 P.2d 425]*.)

Plaintiff alleges that the book as a whole was libelous and that the book contained several false statements of fact.  Plaintiff relies in part on the above quoted conversation between plaintiff and the minister as one

libelous statement of fact.  Plaintiff also argues that a particular incident in the book is libelous. That incident depicts an encounter group patient as so distressed upon leaving from the weekend therapy that she is killed when her car crashes.  Plaintiff also complains of an incident in the book where he is depicted as "pressing," "clutching," and "ripping" a patient's cheeks and "stabbing against a pubic bone." Plaintiff complains, too, of being depicted as having said to a female patient, "Drop it, bitch." There are also other incidents alleged to be libelous. [5]

 [***19] [*77]   CA(12)[🔼] (12) Our inquiry then, is directed to whether or not any of these incidents can be considered false statements of fact.  It is clear from the transcript of the actual encounter weekend proceeding that some of the incidents portrayed by Mitchell are false: i.e., substantially inaccurate description of what actually happened.  It is also clear that some of these portrayals cast plaintiff in a disparaging light since they portray his language and conduct as crude, aggressive, and unprofessional.

Defendants here rely on the cases which have considered the difference in published materials between factual statements and matters of mere opinion. While, as we discuss below, we do not feel that those cases necessarily express the rules applicable where, as here, the published material purports to state actual facts concerning the characters in a novel, we proceed, first, to examine the cases on which defendants rely.

Many cases discuss the difference between fact and opinion.  The court in Greenbelt Pub. Assn. v. Bresler (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537],

examined the use of the term "blackmail" in a controversy between the parties over zoning, and found that, [***20] although the use of that term in some circumstances could constitute libel, in the Bresler case the term was being used figuratively and did not connote actual commission of a crime.

In Letter Carriers v. Austin (1974) 418 U.S. 264 [41 L.Ed.2d 745, 94 S.Ct. 2770], Jack London called someone a "scab," and defined the term with the phrase as a "traitor to his God, his country, his family and his class." ( Id., at p. 268 [41 L.Ed.2d, at p. 753].) Again, the Austin court held that the statements were used loosely and figuratively, and there was no libel in the use of the term "traitor." Thus, words that appear factual at first glance, such as "blackmail," and "traitor" may not be factual, depending on the context in which they were used, and whether they were used figuratively.

The courts have set guidelines in determining what is fact and what is opinion.  One guideline is HN7[🔼] that an alleged defamatory statement may constitute a fact in one context and an opinion in another and content of the communication is taken as a whole.  In certain settings fiery rhetoric and hyperbolic statements of fact may [**39] well assume the character of opinion. ( HN8[🔼] Gregory [***21] v. McDonnell Douglas Corp. (1976) supra, 17 Cal.3d 596.) Where the statements are unambiguously fact or opinion, Gregory applies, and the court determines as a matter of law whether the statements are fact or opinion.  However, where the alleged defamatory [*78] remarks could be determined either as fact or opinion, and the court cannot say as a matter of law that the statements were not understood as fact, there is a triable issue of fact for the jury. ( Good Government Group of Seal Beach, Inc. v. Superior Court (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258,

---

[5] We find it unnecessary to discuss each alleged libel separately, since if any of the alleged libels fulfill all the requirements of libel, that is sufficient to support the judgment.

*586 P.2d 572*].) [6]

If viewed as a case involving an issue of "opinion," those **[\*\*\*22]** cases, and other cases involving that issue, make it clear that, since there was evidence that people had identified plaintiff with the Dr. Herford of the book, the jury's finding against defendants is conclusive on that issue.

However, as we have indicated above, we regard the case at bench as involving a different issue. Defendants contend that the fact that the book was labeled as being a "novel" bars any claim that the writer or publisher could be found to have implied that the characters in the book were factual representations not of the fictional characters but of an actual nonfictional person.   That contention, thus broadly stated, is unsupported by the cases.  *CA(13)*[⬆] (13) *HN9*[⬆] The test is whether a reasonable person, reading the book, would understand that the fictional character therein pictured was, in actual fact, the plaintiff acting as described. ( *Middlebrooks v. Curtis Publishing Co. (4th Cir. 1969) supra, 413 F.2d 141, 143.*) Each case must stand on its own facts.   In some cases, such as *Greenbelt Pub. Assn. v. Bresler (1970) supra, 398 U.S. 6*, an appellate court can, on examination of the entire work, find that no reasonable person would have regarded the **[\*\*\*23]** episodes in the book as being other than the fictional imaginings of the author about how the character he had created would have acted. Similarly, in *Hicks v. Casablanca Records (S.D.N.Y. 1978) 464 F.Supp. 426*, a trier of fact was able to find that, considering the work as a whole, no reasonable

reader would regard an episode, in a book purporting to be a biography of an actual person, to have been anything more than the author's imaginative explanation of an episode in that person's life about which no actual facts were known.   We cannot make any similar determination here.   Whether a reader, identifying plaintiff with the "Dr. Herford" of the book, would regard the passages herein complained of as mere fictional embroidering or as reporting actual language and conduct, was for the jury.   Its verdict adverse to the defendants cannot be overturned by this court.

 **[\*79]** V

Defendants raise the question of whether there is "publication" for libel where the communication is to only one person or a small group of persons rather than to the public at large.     *CA(14)*[⬆]  (14) *HN10*[⬆] Publication for purposes of defamation is sufficient when the publication is to only one person other than the person **[\*\*\*24]** defamed. ( *Brauer v. Globe Newspaper Co. (1966) 351 Mass. 53 [217 N.E.2d 736, 739].*) Therefore, it is irrelevant whether all readers realized plaintiff and Herford were identical.

VI

Appellant Doubleday alleges several charges to the jury were erroneous, and that the court improperly refused to give certain proffered instructions by them.   *CA(15)*[⬆] (15) Doubleday objects that the court erred when it rejected its instruction that Bindrim must prove by clear and convincing evidence that defendants intentionally identified Bindrim.   Firstly, the "clear and convincing evidence" standard applies to the proving that the act was done with "actual malice" and an instruction to that effect was given by the court.   *CA(16)*[⬆]  (16) Secondly, defendants' instructions that the jury must find that a substantial segment of the public did, in fact, believe that Dr. Simon Herford was,  **[\*\*40]** in fact, Paul

---

[6] Here, unlike the *Good Government* case, there is no actual "ambiguous" language in the novel. However, whether the literary incidents were understood by those readers who identified plaintiff with Herford as strictly fictional or as based on fact is similar to the question before the court in "*Good Government*" and the reasoning of that case applies.

92 Cal. App. 3d 61, *79; 155 Cal. Rptr. 29, **40; 1979 Cal. App. LEXIS 1655, ***24

Bindrim, was properly refused.   For the tort of defamation, publication to one other person is sufficient, *ante*.

CA(17)[↑] **(17)** Defendant objects that the court refused the following instruction:

"Defendants' Requested Instruction No. 8

"The following statements in "Touching," and no others, may be considered by you **[***25]** to be possibly libelous:

1. The statement at page __, lines __.

 **[*80]**  "If you find that none of those statements libeled plaintiff, you must find for defendants." Defendants argue that by the refusal of the above instruction the court failed to instruct the jury that it could only assess liability if it determined that the challenged statements were libelous. The court did instruct adequately in that area.  The court instructed:

"Defendants' Instruction No. 9

"In order to recover for libel, plaintiff must prove that a statement in the novel 'Touching" is reasonably susceptible of a libelous interpretation.  In making this determination you should consider the novel as a whole and the context of said statement.

"In determining whether a statement is capable of a libelous meaning, you should construe the words according to the fair and natural meaning that will be given them by reasonable persons of ordinary intelligence."

Defendant Doubleday claims confusion in the instruction on standard of proof.   The instruction on clerk's transcript page 111 explained to the jury the additional burden of proof required for "actual malice."

Defendant alleges that the **[***26]**  court failed to instruct

the jury that the author and publisher should be considered separately for purposes of liability. However, the court did instruct the jury to consider each defendant separately and to decide each defendant's case separately.

CA(18)[↑] **(18)** Appellant Mitchell objects that the trial court erroneously allowed one of Bindrim's identification witnesses, Otto, to testify that a psychologist in 1971 or 1972 who was familiar with nudity and psychotherapy literature would be able to recognize Herford as Bindrim, and that someone who did not know Bindrim personally but was familiar with the literature would recognize Bindrim, citing only *California Evidence Code section 800*.  First of all, defendant's objection to the lower court did not clearly state his ground of objection.  Secondly, there was other evidence of identification by Hoover and by Hiller.   And Otto also testified that he himself identified Bindrim as Herford because Bindrim had written about "peak experiences" and because of the character's style of talking to people.   Therefore, defendant could not have been harmed by the above testimony.

Mitchell also objects that the court erroneously prohibited evidence that plaintiff **[***27]** once had sexual intercourse with a participant.  This was **[*81]** irrelevant as to whether plaintiff was libeled by other inaccurate portrayals of his language and his conduct.

Appellant Mitchell alleged that she and Doubleday were joint tortfeasors and any judgment against them had to be joint and several.   CA(19)[↑] **(19)** HN11[↑] Contributing wrongdoers, whether joint, concurrent or successive tortfeasors are ordinarily jointly and severally liable for the entire damages. ( *Gray v. Sutherland (1954) 124 Cal.App.2d 280 [268 P.2d 754]*.) When they are joined in an action it is improper to apportion compensating damage among them; judgment for the full amount should be rendered against each. ( *HN12[*

92 Cal. App. 3d 61, *81; 155 Cal. Rptr. 29, **40; 1979 Cal. App. LEXIS 1655, ***27

⬆] *Old v. Aetna Ins. Co. (1936) 17 Cal.App.2d 144 [61 P.2d 503]*.) Courts have resolved inconsistencies by the determination of the jury's intention from an examination of the verdict. ( *Snogdrass v. Hand (1934) 220 Cal. 446 [31 P.2d 198]*.) The appellate court will, if possible, make its own correction to uphold the verdict. ( *Woodcock v. Fortana Scaffolding & Equip. Co. (1968) 69 Cal.2d 452, 457 [72 Cal.Rptr.* **[**41]** *217, 445 P.2d 881]*.) In the case at bar, the jury's intent **[***28]** was clear from their verdict, and this court will award plaintiff $ 50,000 as a joint and several award against both defendants, rather than the $ 25,000 against each of the two defendants was awarded by the court. The defendant Doubleday is also liable in $ 25,000 punitive damages.

*The Cross-Appeal*

*CA(20)*[⬆] **(20)** Bindrim contends that the trial court erred in striking the damage award on the contract count. We are aware of no authority that a professional person can, by contract or otherwise, prevent one of his patients from reporting the treatment that patient received. Since the whole theory of plaintiff's therapy was that of group encounter, what Mitchell saw done to and by other members of the group was part of her own treatment. She was free to report what went on. The limits to her right to report were those involved in the libel counts. Plaintiff has no separate cause of action for the mere reporting.

In addition, although plaintiff testified in broad language that he had been damaged by the publication of the book, it is not clear how much, if any, of that damage flowed from the inaccuracies in the book as distinguished from the fact that his encounter therapy had been given **[***29]** publicity. On this record, we cannot say that the trial court erred.

*CA(21)*[⬆] **(21)** Finally, cross-appellant Bindrim argues

that the reduction on the compensatory damage amount against Mitchell on the libel count should **[*82]** be restored. The judge reduced the verdict against Mitchell from $ 38,000 to $ 25,000 on the ground that there was no evidence that the publication of the libel to Mrs. Hoover caused any damage. We agree with the court's determination that Mrs. Hoover was fully aware of what actually happened at the session, and therefore that plaintiff could not have been damaged by any publication to her.

Cross-respondents argue that the compensatory damages should be reduced to a total of $ 25,000 against both defendants. Judge Wells entered a judgment in the sum of $ 50,000, by charging each defendant $ 25,000. The jury's verdict should be reconciled when possible. ( *Maheau v. Hughes Tool Co. (1977) supra, 569 F.2d 459*.) Insofar as the defendants are jointly and severally liable as joint or successive tortfeasors, we enter a $ 50,000 compensatory damage verdict against both defendants, for which they are jointly or severally liable.

Plaintiff's cross-appeal on the **[***30]** issue of punitive damages is well taken and the $ 25,000 award of punitive damages by the jury against Doubleday should stand. The jury had discretion not to award punitive damages against one of the defendants, since as we have said before, the greater wealth of one defendant is relevant.

The judgment, as modified on the motion for a new trial, is further modified as follows:

(1) By substituting for separate judgments against defendants Mitchell and Doubleday a joint and several judgment against both of said defendants in the amount of $ 50,000; and

(2) By including in said judgment a separate judgment against Doubleday of $ 25,000 for punitive damages.

Otherwise the judgment is affirmed. Neither party shall recover costs on appeal.

**Concur by:** JEFFERSON

# Concur

**JEFFERSON (Bernard), J.** Although I agree with the majority opinion authored by Justice Kingsley, I am writing a separate concurring opinion in order to comment upon the dissenting opinion. The dissent erroneously describes the majority holding as creating a cause of action for libel out of a work of fiction that attacks the techniques of "nude encounter therapy." Because of this misconception with respect to the majority's **[***31]** **[*83]** holding, the dissent the conclusion that the majority's view "poses a grave threat to any future work of fiction which explores the effect of techniques claimed to have curative value."

Had the defendant author of the work of fiction limited her novel to a truthful or fictional description of the techniques employed in nude encounter therapy, I would agree with the dissent that plaintiff had no cause of action for defamation. But here **[**42]** we have a description of a therapist as using insulting and vulgar language of the rankest sort in addressing his patients. Apparently the dissent does not consider that such language is capable of being considered defamatory of plaintiff in his professional role of a therapist practicing nude encounter therapy. The vulgarity purportedly used by the therapist in the novel would necessarily be considered by numerous persons as completely unprofessional and defamatory if used by a professional therapist such as the plaintiff. I fail to see how any jury or any court could consider such crude vulgarity as *not* defaming a professional therapist to whom such vulgarity was attributed in the practice of his profession. I need not **[***32]** repeat this language here as it is set forth in the majority opinion.

'"The code definition of libel is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or *with respect to his occupation.*'" ( *MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 546 [343 P.2d 36]*.) (Italics added.)

The dissent concludes that the "average reader" would not have considered plaintiff defamed as a professional therapist who used the crude and vulgar language. But the dissent does not tell us what constitutes an "average reader." I assume that novels are read by the learned, the not so learned, and persons in all walks of life. It is my view that any reader of the novel, whether familiar with a professional therapist's practices or not, might well conclude that a therapist described in the novel was a lewd and dissolute character in the practice of his profession. As indicated in *MacLeod*, a "publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the **[***33]** average reader." ( *MacLeod, supra, 52 Cal.2d 536, 547*.)

The case at bench is not like that of *Greenbelt Pub. Assn v. Bresler (1970) 398 U.S. 6, 14 [26 L.Ed.2d 6, 15, 90 S.Ct. 1537]*, in which the court emphasized that "[*no*] *reader*" could have thought that a newspaper **[*84]** which reported words of speakers were charging a developer with the commission of a crime in using the phrase "blackmail," and that, on the contrary, "*even the most careless reader* must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet . . . ." ( *Id. at p. 14 [26 L.Ed.2d at p. 15]*.) (Italics added.) The *Greenbelt* court seems to place all readers -- careful and careless alike -- as average readers.

The dissent finds error in the instruction given the jury on the issue of identification. The use of the word "reasonably" in the instruction dissipates the dissent's view that only one person was required to understand the defamatory meaning.  If one person "reasonably" understood the defamatory character of the language used, it describes what readers generally would "reasonably" understand.   I see no basis for the dissent's view that the **[\*\*\*34]** instruction had the result of mulcting defendants for the exercise of their first amendment right to comment on the nude marathon. The first amendment right to comment does *not* include the right to commit libel.

The dissent sees in the majority opinion a branding of a novel as libelous because it is critical of an occupational practice.  This is a distortion of the majority's position.  The position of the majority is simply to refuse to permit a writer and publisher to libel a person and hide under the banner of having written only fictional material.  "Of course the fictional setting does not insure immunity when a reasonable man would understand that the fictional character was a portrayal of the plaintiff. 'Reputations may not be traduced with impunity, whether under the literary forms of a work of fiction or in jest.'" ( *Middlebrooks v. Curtis Publishing Company (4th Cir. 1969) 413 F.2d 141, 143*.)

**Dissent by:** FILES

# Dissent

**FILES, P. J.,** Dissenting.  This novel, which is presented to its readers as a work of fiction, contains a portrayal of nude encounter therapy, and its tragic effect upon an apparently happy and well-adjusted woman who subjected herself to it.  Plaintiff **[\*\*\*35]** is a practitioner of this kind of therapy. His grievance, as described in his **[\*\*43]** testimony and in his briefs on appeal, is

provoked by that institutional criticism. [1]  Plaintiff's "concession" that he **[\*85]** is a public figure appears to be a tactic to enhance his argument that any unflattering portrayal of this kind of therapy defames him.

The decision of the majority upholding a substantial award of damages against **[\*\*\*36]** the author and publisher poses a grave threat to any future work of fiction which explores the effect of techniques claimed to have curative value.

The majority opinion rests upon a number of misconceptions of the record and the law of libel. I mention a few of them.

*Defamation.*

Libel is a false and unprivileged publication which exposes any person to hatred, contempt, ridicule or obloquy, or which causes him to be shunned or avoided or which has a tendency to injure him in his occupation. ( *Civ. Code, § 45*.) A libel which is defamatory without the necessity of explanatory matter is said to be a libel on its face.  Language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a result thereof.  ( *Civ. Code, § 45a*.)

Whether or not matter is on its face reasonably susceptible of a libelous meaning is a question of law.  (

_____

[1] The record demonstrates the essential truth of the author's thesis.  A tape recording of an actual encounter session conducted by plaintiff contains this admonition to the departing patients: ". . . Now, to top that off, you're turned on, that is you're about as turned on as if you've had 50 or 75 gammas of LSD.  That's the estimate of the degree of the turn-on is.  And it doesn't feel that way, because you're [*sic*] been getting higher a little bit at a time.  So don't wait to find out, take may word for it, and drive like you've had three or four martinis. Drive cautiously."

92 Cal. App. 3d 61, *85; 155 Cal. Rptr. 29, **43; 1979 Cal. App. LEXIS 1655, ***36

*McLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 546 [343 P.2d 36]*.)

The complaint in this action quotes verbatim the portions of the defendant's novel which are alleged to be libelous. No explanatory matter or special damages are alleged. The only arguably defamatory matter **[***37]** I can find in that complaint is in the passages which portray the fictional therapist using coarse, vulgar and insulting language in addressing his patients. Some of the therapeutic techniques described in the quoted passages may seem bizarre, but a court cannot assume that such conduct is so inappropriate that a reputable therapist would be defamed if that technique were imputed to him. The alleged defamation therefore is limited to the imputation of vulgar speech and insulting manners.

The defendants asked the trial court to give an instruction to the jury identifying the matter which it could consider as defamatory. The trial court refused. Instead, the court sent the case to the jury without distinction between actionable defamation and constitutionally protected criticism. In addition, the trial court's instructions authorized the jury to **[*86]** award special damages for loss of income which could have resulted from the lawful expression of opinion.

*Identification.*

Whether or not an allegedly defamatory communication was made "of and concerning the plaintiff" is an issue involving constitutional rights. ( *New York Times v. Sullivan (1964) 376 U.S. 254, [***38] 288 [11 L.Ed.2d 686, 711, 84 S.Ct. 710, 95 A.L.R. 1412]*; see *Rest. 2d Torts, § 580A com. (g)*.) Criticism of an institution, profession or technique is protected by the First Amendment; and such criticism may not be suppressed merely because it may reflect adversely upon someone who cherishes the institution or is a part of it.

Defendants' novel describes a fictitious therapist who is conspicuously different from plaintiff in name, physical appearance, age, personality and profession.

Indeed the fictitious Dr. Herford has nor of the characteristics of plaintiff except that Dr. Herford practices nude encounter therapy. Only three witnesses, other than plaintiff himself, testified that they "recognized" plaintiff as the fictitious Dr. Herford. All three of those witnesses had participated in or observed one of plaintiff's nude marathons. The only characteristic mentioned by any of the three witnesses as **[**44]** identifying plaintiff was the therapy practiced.

Plaintiff was cross-examined in detail about what he saw that identified him in the novel. Every answer he gave on this subject referred to how the fictitious Dr. Herford dealt with his patients. (See appendix C to **[***39]** opening brief of Mitchell.)

Plaintiff has no monopoly upon the encounter therapy which he calls "nude marathon." Witnesses testified without contradiction that other professionals use something of this kind. There does not appear to be any reason why anyone could not conduct a "marathon" using the style if not the full substance of plaintiff's practices.

Plaintiff's brief discusses the therapeutic practices of the fictitious Dr. Herford in two categories: Those practices which are similar to plaintiff's technique are classified as identifying. Those which are unlike plaintiff's are called libelous because they are false. Plaintiff has thus resurrected the spurious logic which Professor Kalven found in the position of the **[*87]** plaintiff in *New York Times v. Sullivan, supra, 376 U.S. 254*. Kalven wrote: "There is revealed here a new technique by which defamation might be endlessly manufactured. First, it is argued that, contrary to all appearances, a statement referred to the plaintiff; then, that it falsely ascribed to

92 Cal. App. 3d 61, *87; 155 Cal. Rptr. 29, **44; 1979 Cal. App. LEXIS 1655, ***39

the plaintiff something that he did not do, which should be rather easy to prove about a statement that did not refer to plaintiff in the first place . **[\*\*\*40]** . . ." Kalven, *The New York Times Case. A Note on "The Central Meaning of the First Amendment*," 1964 Sup. Ct. Rev. 191, 199.

Even if we accept the plaintiff's thesis that criticism of nude encounter therapy may be interpreted as libel of one practitioner, the evidence does not support a finding in favor of plaintiff.

Whether or not a publication to the general public is defamatory is "whether in the mind of the average reader the publication, considered as a whole, could reasonably be considered as defamatory." ( *Patton v. Royal Industries, Inc. (1968) 263 Cal.App.2d 760, 765 [70 Cal.Rptr. 44]*. See *Good Government Group of Seal Beach, Inc. v. Superior Court (1978) 22 Cal.3d 672, 682 [150 Cal.Rptr. 258, 586 P.2d 572]*; *Rest. 2d Torts, § 559, com. (e)*.)

The majority opinion contains this juxtaposition of ideas: "Secondly, defendants' [proposed] instructions that the jury must find that a substantial segment of the public did, in fact, believe that Dr. Simon Herford was, in fact, Paul Bindrim was properly refused. For the tort of defamation, publication to one other person is sufficient, *ante*."

The first sentence refers to the question whether **[\*\*\*41]** the publication was defamatory of plaintiff. The second refers to whether the defamatory matter was published. The former is an issue in this case. The latter is not. Of course, a publication to one person may constitute actionable libel. But this has no bearing on the principle that the allegedly libelous effect of a publication to the public generally is to be tested by the impression made on the average reader.

*The jury instruction on identification.*

The only instruction given the jury on the issue of identification stated that plaintiff had the burden of proving "That a third person read the statement and reasonably understood the defamatory meaning and that the statement applied to plaintiff."

**[\*88]** That instruction was erroneous and prejudicial in that it only required proof that one "third person" understood the defamatory meaning.

The word "applied" was most unfortunate in the context of this instruction. The novel was about nude encounter therapy. Plaintiff practiced nude encounter therapy. Of course the novel "applied to plaintiff," particularly insofar as it exposed what may result from such therapy. This instruction invited the jury to find that plaintiff **[\*\*\*42]** was libeled by criticism of the kind of therapy he practiced. The effect is to mulct the defendants for the exercise of their First Amendment right to comment on the nude marathon.

*Malice.*

The majority opinion adopts the position that actual malice may be inferred from the fact that the book was "false." That inference **[\*\*45]** is permissible against a defendant who has purported to state the truth. But when the publication purports to be fiction, it is absurd to infer malice because the fiction is false.

As the majority agrees, a public figure may not recover damages for libel unless "actual malice" is shown. Sufficiency of the evidence on this issue is another constitutional issue. ( *St. Amant v. Thompson (1968) 390 U.S. 727, 730 [20 L.Ed.2d 262, 266-267, 88 S.Ct. 1323]*.) Actual malice is a state of mind, even though it often can be proven only by circumstantial evidence. The only apparent purpose of the defendants was to write and publish a novel. There is not the slightest evidence of any intent on the part of either to harm plaintiff. No purpose for wanting to harm him has been

suggested.

The majority opinion seems to say malice is proved by Doubleday's **[\*\*\*43]** continuing to publish the novel after receiving a letter from an attorney (not plaintiff's present attorney) which demanded that Doubleday discontinue publication "for the reasons stated in" a letter addressed to Gwen Davis.    An examination of the latter demonstrates the fallacy of that inference.

The letter to Davis [Mitchell] asserted that the book violated a confidential relationship, invaded plaintiff's privacy, libelled him and violated a "common law copyright" by "using the unpublished words" of plaintiff. It added "From your said [television] appearances, as well as from the book, it is unmistakable that the 'Simon Herford' mentioned in your book refers to my client."

 **[\*89]**  The letters did not assert that any statement of purported fact in the book was false.    The only allegation of falsity was this: "In these [television] appearances you stated, directly or indirectly, that nude encounter workshops, similar to the one you attended, are harmful.  The truth is that those attending my client's workshops derive substantial benefit from their attendance at such workshops."

These letters gave Doubleday no factual information which would indicate that the book libelled **[\*\*\*44]** plaintiff.

The letters did not put Doubleday on notice of anything except that plaintiff was distressed by the expression of an opinion unfavorable to nude encounter therapy -- an expression protected by the First Amendment. (See *Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 339 [41 L.Ed.2d 789, 805, 94 S.Ct. 2997]*; *Gregory v. McDonnell Douglas Corp. (1976) 17 Cal.3d 596, 600 [131 Cal.Rptr. 641, 552 P.2d 425]*.)

From an analytical standpoint, the chief vice of the majority opinion is that it brands a novel as libelous because it is "false," i.e., fiction; and infers "actual malice" from the fact that the author and publisher knew it was not a true representation of plaintiff.   From a constitutional standpoint the vice is the chilling effect upon the publisher of any novel critical of any occupational practice, inviting litigation on the theory "when you criticize my occupation, you libel me."

I would reverse the judgment.

_____

End of Document

## *Baker v. PrivatAir, Inc; 2005 Jury Verdicts LEXIS 55651*

BC322198

December 13, 2005

**Headline:** Pilot terminated: Age discrimination: Defamation: Emotional distress: Lost income: Verdict: Punitive damages.

**Published Date:** June 2006

**Topic:** EMPLOYMENT LAW

**Practice Area:** Labor and Employment Law; Torts; Transportation Law

**Case Resolution:** plaintiff verdict

**State:** California

**Court:** California Superior Court, Los Angeles County

**Plaintiff Counsel**
**AAJ members**

Michael L. Kelly

Address: El Segundo,  Cal.

**Case Summary**

Baker, 61, had served as chief pilot for a private aircraft owned by Bruce Willis and Demi Moore for nine years. In 2002, Willis and Moore bought an airplane from PrivatAir, which became the employer of the flight crew. A flight attendant, with the help of two other pilots on the crew, allegedly wrote a letter to Willis, Moore, PrivatAir, and the Federal Aviation Administration (FAA), contending Baker committed safety violations and saying Baker was too old to fly. The letter accused Baker of having an alcohol problem, making illegal approaches, and talking on his cell phone while piloting, among other things. PrivatAir subsequently hired a third party to investigate the alleged safety violations. The investigators concluded Baker committed safety violations but allegedly relied on anonymous quotes rather than objective findings. The investigating firm sent a copy of the report to Willis and Moore.

PrivatAir fired Baker, promoted one of the other pilots, and filled the vacant position with a 39-year-old pilot, who allegedly was less qualified and was hired because she was the wife of a crew member's friend. Baker had been earning $ 140,000 annually as a pilot but has been unable to obtain employment as a result of the termination. His lost income is between $ 600,000 and $ 1.6 million.

Baker v. PrivatAir, Inc; 2005 Jury Verdicts LEXIS 55651

Baker sued the airline, the flight attendant, and the two pilots, alleging age discrimination under the state fair employment act, defamation, and intentional infliction of emotional distress. Plaintiff alleged defendants conspired to terminate him for personal reasons. Plaintiff offered e-mail correspondence among the flight crew members and between the crew and the investigating firm indicating they were working together to get him fired. The other pilots allegedly wanted him fired so that they would be promoted and the younger pilot would be hired. Plaintiff alleged the e-mails showed the airline wanted to fire him because he was too protective of the airplane owners' money.

A jury awarded plaintiff about $ 63.9 million, including about $ 10.01 million in punitive damages. PrivatAir is responsible for approximately $ 32.23 million, the flight attendant is liable for about $ 12.72 million, and the pilots are responsible for about $ 15.73 million and $ 3.22 million respectively. Defendants are reportedly considering posttrial motions.

**Plaintiff Expert(s)**

Robert Ditchey

Address: Marina Del Rey,  Cal.

Specialty: FAA regulations/flight safety

David Weiner

Address: Los Angeles,  Cal.

Specialty: economics

Brian H. Kleiner

Address: Fullerton,  Cal.

Specialty: human resources investigations

**Defendant Expert(s)**

Robert Griscom

Address: San Diego,  Cal.

Specialty: FAA regulations/flight safety

Robert C. Hulse

Address: San Juan Capistrano,  Cal.

Specialty: FAA regulations/flight safety

**Award:** $ 63,900,000

Copyright © 2006 American Association for Justice
Law Reporter

Baker v. PrivatAir, Inc; 2005 Jury Verdicts LEXIS 55651

Volume 49, Number 5

---

End of Document

*Roger Hughes, d/b/a R.D. Hughes Drywall v. Carpenters 46 Northern California Counties Conference Board, Joe Hart, Northern California Carpenters Regional Council, United Brotherhood of Carpenters & Joiners of America Local Union 751, Aaron Hadzess, and Mike Munoz; 2005 Jury Verdicts LEXIS 43153*

CV-233062

August 30, 2005

**Headline:** Union Spread Rumor of Lewd Act About Business Owner

**Published Date:** October 15, 2005

**Topic:** Employment - Intentional Torts - Defamation - Defamation - False Light - Labor Relations - NLRB - Labor Relations - Workplace - Labor Law

**Injury:** Emotional Distress, Psychological

**Practice Area:** Criminal Law and Procedure; Governments; Torts

**State:** California

*Court: Superior Court of Sonoma County, Sonoma*

**Plaintiff Counsel**

Charles D. Cochran

Firm Name: Hinton, Cochran & Borba

Address: Santa Rosa, CA

Plaintiff Name: (R.D. Hughes Drywall, Roger D. Hughes)

Rachael R.J. Erickson

Firm Name: Hinton, Cochran & Borba

Address: Santa Rosa, CA

Plaintiff Name: (R.D. Hughes Drywall, Roger D. Hughes)

**Defendant Counsel**

Kristina L. Hillman

Firm Name: Weinberg, Roger & Rosenfeld

Roger Hughes, d/b/a R.D. Hughes Drywall v. Carpenters 46 Northern California Counties Conference Board, Joe Hart, Northern California Carpenters Regional Counci....

Address: Oakland, CA

Defendant Name: (Carpenters 46, International Brotherhood of Carpenters and Joiners, Joe Hart, Northern California Carpenters Regional Council)

Sandrae Benson

Firm Name: Weinberg, Roger & Rosenfeld

Address: Alameda, CA

Defendant Name: (Carpenters 46, International Brotherhood of Carpenters and Joiners, Joe Hart, Northern California Carpenters Regional Council)

**Judge:** Ray Giordano

**Case Summary**

On March 22, 2002, union picketers staged a protest outside the office of plaintiff Roger Hughes, owner of R.D. Hughes Drywall. The picketers, from the Northern California Carpenters Regional Council, carried signs depicting Hughes as a fat pig, and wore apparel promoting his largest competitor. In response, Hughes went outside to his truck, retrieved a union jacket, and gestured as if he were urinating on the garment.

NCCRC field representative Aaron Hadzess then instructed all picketers to convene at Local 751's union hall, where they drafted statements that Hughes had exposed himself in public, and then the union submitted those statements to the Santa Rosa Police as part of criminal complaint of indecent exposure.

The _Sonoma County_ District Attorney reviewed the complaint against Hughes, but never arrested Hughes or filed charges.

In May 2002, Hadzess obtained a controlled copy of the police report, which NCCRC Director of Organizing Mike Munoz incorporated into a flyer in July 2002. Munoz deleted any indication on the flyer that the police report had been redacted, as well as the "Do Not Duplicate" disclaimer printed on the original report.

The flyer was distributed by hand and by mail to residents, sales offices at subcontracting sites and construction businesses throughout _Sonoma County_ communities.

Hughes sued the NCCRC; Hadzess; Munoz; Carpenters 46, Northern California _Counties_ Conference Board (an administrative branch of the NCCRC); Joe Hart (an NCCRC field representative); and United Brotherhood of Carpenters and Joiners of America Local 751 (a chapter within the NCCRC which answers to it). He claimed defamation, alleging that the flyers cast him in a false light and the defendants acted with a conscious disregard for the truth when they distributed it.

Carpenters 46 argued that it was not involved with the circulation of the flier, claiming it was just an administrative branch of the NCCRC and it was dismissed from the case by Hughes before trial.

Roger Hughes, d/b/a R.D. Hughes Drywall v. Carpenters 46 Northern California Counties Conference Board, Joe Hart, Northern California Carpenters Regional Counci....

Judge Ray Giordano ruled that Hart, Hadzess and Munoz were exempt from liability under a federal statute protecting union workers from being individually prosecuted for union activities.

The trial was bifurcated, the first phase was to address liability and, in the event it was found, the second was to address punitives.

The defendants denied that they mailed the flyers, and maintained that the truthe of its contents. The defendants testified that the flyer's sole intent was to notify the public that Hughes was failing to pay union wages and meet benefit standards.

Hughes countered that there was no mention of wages or benefits on the flyer.

The defendants also claimed they were protected under the National Labor Relations Act.

**Injury Text:**

Hughes claimed that after the flyers were disseminated, he was inundated at home and at work with phone calls and had to hold meetings with associates, friends and clients trying to convince them the flyers were not true. He claimed he suffered emotional distress and recurring nightmares caused by the circulation of the flyers.

He sought $2,500 worth of bills for psychology treatment.

Hughes also sought $742,000 for his past economic losses pain and suffering, and $342,000 for future pain and suffering.

As for the punitive charge in the phase two of the biurcated case, the jury heard testimony from a union controller that the net worth of the NCCRC was close to $44 million, including $36 million in liquid assetts. Under California law, a plaintiff can recieve a punitive judgement worth up to 10% of a company's net worth, and Hughes requested $3.5 million.

Because the duplication of the controlled police report was in violation of the California Civil Code, exemplary damages of more than $200,000 were also sought.

Hughes total damage claim was about $4,586,500.

Defendants disputed Hughes' psychological damage, arguing that any emotional distress was simply a result of a fair union activity.

The defense also disputed Hughes' economic damages on the grounds that he was unable to call a single witness corroborating that he wasn't hired for a drywall job as a direct result of the flyers.

**Trial Length**

5.0 s

Roger Hughes, d/b/a R.D. Hughes Drywall v. Carpenters 46 Northern California Counties Conference Board, Joe Hart, Northern California Carpenters Regional Counci....

**Jury Poll**

10-2

**Post Trial Status**

Defense plans to appeal the verdict.

**Plaintiff Amounts:**

(Roger D. Hughes)

$2,470 Personal Injury: Past Medical Cost

$75,000 Personal Injury: Past Pain And Suffering

$22,500 Personal Injury: Future Pain And Suffering

$250,000 Commercial: Statutory Additional Damages

$1,000,000 Commercial: Punitive Exemplary Damages

**Plaintiff Expert(s)**

Nancy Watson

Specialty: Labor Economics, Labor law, Charles Cochran, Rachael Erickson

**Award:** $ 1,349,970

**Award Details:** In the first phase, the jury found the NCCRC liable for defamation. It awarded Hughes $2,470 for past medical expenses, $22,500 for future pain and suffering, and $75,000 for past pain and suffering. No lost earnings were awarded. (Local 751 was found not liable, but is in fact a subsidiary member to the NCCRC).

The jury assessed $1 million in punitive damages, and another $250,000 in exemplary damages for duplicating the report.

*www.verdictsearch.com/index.jsp*

Copyright 2005 ALM Media Properties, LLC.
 All Rights Reserved
 Further duplication without permission is prohibited
VerdictSearch
California Reporter Vol. 4

Roger Hughes, d/b/a R.D. Hughes Drywall v. Carpenters 46 Northern California Counties Conference Board,

Joe Hart, Northern California Carpenters Regional Counci....

---

End of Document

## *Khalid Iqbal Khawar, et al. v. Globe International, Inc., et al; 2021 Mealey's CA Jury Verdicts & Settlements 36*

WEC139685 and SC003094

**Headline:** Photojournalist Awarded $1,175,000 In California Defamation Action Against Tabloid Newspaper, Book Publisher And Author

**Result:** $1,175,000 plaintiff verdict (consisting of $100,000 for injury to reputation, $400,000 for emotional distress, $175,000 in presumed damages, $500,000 in punitive damages)

**Court:** Calif. Super., Los Angeles Co.

**Judge:** Richard G. Harris

**Plaintiff Profile**

Khalid Iqbal Khawar and Ali Ahmad

**Defendant Profile**

Globe International Inc., Roundtable Publishing Inc., Robert Morrow

**Case Summary**

**Claim:** Defamation

**Background:** Khalid Iqbal Khawar, a photojournalist, sued Globe International Inc., Roundtable Publishing Inc. and Robert Morrow in the Superior Court of Los Angeles County, seeking to recover damages for defamation. Specifically, the plaintiff alleged that he was the person depicted in *photographs* and identified in a book by Morrow as an assassin, and that the book's accusation (repeated in a Globe article) that he had assassinated a famous politician was false and defamatory and had caused him substantial injury. Khawar's father, Ali Ahmad, brought a separate defamation suit against the same defendants. The two actions were consolidated.

**Other:** The trial court granted Globe International's motion for nonsuit as to Ahmad on the ground that the allegedly defamatory statements in the Globe article were not "of and concerning" Ahmad. However, the jury awarded Khawar $100,000 for injury to his reputation, $400,000 for emotional distress, $175,000 in presumed damages and, after a separate punitive damages phase, $500,000 in punitive damages. Thereafter, the trial court granted judgment on the special verdicts for Khawar and against the Globe in the amount of $1,175,000.

Copyright LexisNexis, Division of Reed Elsevier Inc.
LexisNexis Jury Verdicts and Settlements Report

# *Bradley Stephen Cohen; Cohen Asset Management, Inc., a California corporation v. Ross B. Hansen; Northwest Territorial Mint, LLC, a Washington limited liability company; Steven Earl Firebaugh; 2016 Jury Verdicts LEXIS 1237*

2:12-cv-01401-JCM-PAL

February 17, 2016

**Headline:**    Nevada Federal Jury Awards Asset Management Corporation And President $ 38.3 Million In Defamation Suit Against Company And Individuals Who Created Websites Comparing Company President To Bernie Madoff

**Party Names**

Plaintiff(s):

Cohen, Bradley Stephen

Cohen Asset Management, Inc., a California corporation

Defendant(s):

Hansen, Ross B.

Northwest Territorial Mint, LLC, a Washington limited liability company

Firebaugh, Steven Earl

**Topic:** Intentional Torts

**Injury:** Economic Injury; Emotional Or Mental Injury; Physical Injury

**Practice Area:** Civil Procedure; Computer and Internet Law; Torts

**Method of Resolution:** Trial

**Case Resolution:**    For Plaintiff

**All Dates:** 08/08/2012 Complaint Filed

   03/04/2013 Amended Complaint Filed

   07/11/2013 Answer Filed

   06/09/2015 Order for Motion for Summary Judgment Entered

   02/17/2016 Verdicts Reached

**State:** Nevada

Bradley Stephen Cohen; Cohen Asset Management, Inc., a California corporation v. Ross B. Hansen;
Northwest Territorial Mint, LLC, a Washington limited liability....

**Court:** US District Court for the District of Nevada

**Plaintiff Counsel**

David Chesnoff

Firm Name: Chesnoff & Schonfeld

Address: Las Vegas Nevada

Richard Schonfeld

Firm Name: Chesnoff & Schonfeld

Address: Las Vegas Nevada

Robert D. Mitchell

Firm Name: Mitchell & Associates, P.C.

Address: Phoenix Arizona

Anthony Michael Glassman

Firm Name: Glassman, Browning, Saltsman & Jacobs, Inc.

Address: Beverly Hills California

David Chesnoff

Firm Name: Chesnoff & Schonfeld

Address: Las Vegas Nevada

Richard Schonfeld

Firm Name: Chesnoff & Schonfeld

Address: Las Vegas Nevada

Robert D. Mitchell

Firm Name: Mitchell & Associates, P.C.

Address: Phoenix Arizona

Anthony Michael Glassman

Firm Name: Glassman, Browning, Saltsman & Jacobs, Inc.

Address: Beverly Hills California

**Defendant Counsel**

Dean G. von Kallenbach

Bradley Stephen Cohen; Cohen Asset Management, Inc., a California corporation v. Ross B. Hansen;

Northwest Territorial Mint, LLC, a Washington limited liability....

Firm Name: Young deNormandie, P.C.

Address: Seattle Washington

John P. Aldrich

Firm Name: Aldrich Law Firm, Ltd.

Address: Las Vegas Nevada

Dean G. von Kallenbach

Firm Name: Young deNormandie, P.C.

Address: Seattle Washington

John P. Aldrich

Firm Name: Aldrich Law Firm, Ltd.

Address: Las Vegas Nevada

Dean G. von Kallenbach

Firm Name: Young deNormandie, P.C.

Address: Seattle Washington

John P. Aldrich

Firm Name: Aldrich Law Firm, Ltd.

Address: Las Vegas Nevada

**Judge:** James C. Mahan

### Case Summary

Bradley Stephen Cohen was the president of Cohen Asset Management, Inc. (CAM). In April 2012, Cohen discovered websites located at bradley-cohen.com and bradleyscohen.com that contained intentionally false and disparaging statements, falsely stated Cohen had been convicted of fraud, and compared Cohen to Bernard Madoff. Cohen discovered Ross B. Hansen, his company Northwest Territorial Mint, LLC, and Steven Earl Firebaugh set up the websites anonymously and attempted to hide their connection to the sites. Cohen argued the websites contained numerous explicit and implicit false and defamatory statements and were created for the purpose of damaging the reputation of Cohen and CAM. Cohen also argued the websites were set up to retaliate against Cohen for lawsuits a Cohen affiliate filed against Hansen and Northwest.

   On Aug. 8, 2012, Cohen and CAM filed suit against Hansen, Northwest, and Firebaugh in the United States District Court for the District of Nevada. The plaintiffs asserted claims of defamation, defamation per se, invasion of

Bradley Stephen Cohen; Cohen Asset Management, Inc., a California corporation v. Ross B. Hansen; Northwest Territorial Mint, LLC, a Washington limited liability....

privacy/false light, intentional infliction of emotional distress, and intentional interference with prospective business advantage.

The defendants filed a motion for summary judgment. On June 9, 2015, Judge James C. Mahan granted the motion with respect to the plaintiffs' defamation and intentional interference with future expected business claims and CAM's claim of invasion of privacy/false light.

Trial on the remaining claims of defamation per se and false light/invasion of privacy proceeded. On Feb. 17, 2016, the jury found in favor of the plaintiffs on all claims. As for Cohen's defamation per se claims, the jury awarded Cohen $ 7,000,000 in damages against Hansen, $ 3,000,000 in damages against Northwest, and $ 100,000.00 in damages against Firebaugh. As for CAM's defamation per se claims, the jury awarded CAM $ 10,000,000 in damages against Hansen, $ 5,000,000 in damages against Northwest, and $ 100,000.00 in damages against Firebaugh. As to Cohen's false light/invasion of privacy claims, the jury awarded Cohen $ 7,000,000 in damages against Hansen, $ 3,000,000 in damages against Northwest, and $ 100,000 against Firebaugh. The jury found the defendants engaged in their wrongful conduct with fraud, oppression and malice. The jury awarded Cohen $ 500,000 in punitive damages against Hansen and $ 500,000 in punitive damages against Northwest and awarded CAM $ 500,000 in punitive damages against Hansen and $ 500,000 in punitive damages against Northwest for the defamation per se claims. The jury also awarded Cohen $ 500,000 in *punitive damages* against Hansen and $ 500,000 in *punitive damages* against Northwest for *false light*/invasion of privacy. According to a Law360 article, Cohen's law firm believed the verdict may have been the largest internet defamation award in United States history.

**Award:** $38,300,000

Copyright © 2016 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

End of Document

## *Cheryl Sanders v. Constance Jean Walsh and Wiggin Out Salons, Inc; 2012 Jury Verdicts LEXIS 28986*

2010-00435218

July 13, 2012

**Headline:**    California State Court Awards Individual $ 24,000 In Action Against Wig Shop And Its Owner For Defamation And Emotional Distress Regarding Internet Post Statements

**Party Names**

Plaintiff(s):

Sanders, Cheryl

Defendant(s):

Walsh, Constance Jean

Wiggin Out Salons, Inc.

**Topic:** Intentional Torts

**Injury:** Loss Of Reputation; Emotional Or Mental Injury; Economic Injury

**Practice Area:** Civil Procedure; Computer and Internet Law; Governments; Torts

**Method of Resolution:** Trial

**Case Resolution:**    For Plaintiff

**All Dates:** 12/22/2010 Complaint

   07/15/2011 Answer and Affirmative Defense Filed

   07/13/2012 Judgment Rendered

**State:** California

**Court:** California Superior Court, Orange County

**Plaintiff Counsel**

Timothy P. Miller

Firm Name: Law Offices of Timothy P. Miller

Address: Riverside California

Cheryl Sanders v. Constance Jean Walsh and Wiggin Out Salons, Inc; 2012 Jury Verdicts LEXIS 28986

**Defendant Counsel**

Kevin Doran

Firm Name: Law Office of Kevin Doran

Address: West Hollywood California

**Judge:** Charles Margines

**Case Summary**

Cheryl Sanders stated that in June 2009 her mother purchased a wig from Wiggin Out Salons, Inc. due to loss of her hair while undergoing chemotherapy. Sanders asserted that the owner of Wiggin Out, Constance Jean Walsh, represented that the wig was custom made and that after realizing the wig was not custom made her mother attempted to return the wig. Sanders further asserted that Sanders had paid for the wig with a check and that she stopped payment on the check. Wiggin Out sued Sanders's mother in small claims court for breach of contract and her mother prevailed in that action. Sanders claimed that Wiggin Out and Walsh published an online posting regarding the circumstances of the small claims action. Sanders further claimed that the posting stated that Sanders had used an unauthorized check to purchase the wig and that Sanders fabricated a letter from FedEx to try to prove that her mother attempted to return the wig. Sanders alleged that additional anonymous postings were made stating that in her position in the City of Anaheim planning department Sanders accepted bribes regarding construction contracts. Sanders worked in the public utilities department and did not work in the planning department.

   On Dec. 22, 2010, Sanders sued Walsh and Wiggin Out in the California Superior Court, Orange County. Sanders asserted claims for libel, *false light*, intentional infliction of emotional distress, and negligent infliction of emotional distress. Sanders also sought *punitive damages*.

   On July 15, 2011, Walsh and Wiggin Out filed an answer. Walsh and Wiggin Out asserted the truth as an affirmative defense.

   A bench trial was held. On July 13, 2012, Judge Charles Margines rendered judgment in favor of Sanders on the claims for intentional infliction of emotional distress, defamation, and for *punitive damages*. Sanders was awarded $ 24,000.

**Award:** $24,000

**Award Details:** $ 24,000 - Total Award

   $ 10,000 - Intentional Infliction of Emotional Distress

   $ 10,000 - Defamation

   $ 4,000 - *Punitive Damages*



Cheryl Sanders v. Constance Jean Walsh and Wiggin Out Salons, Inc; 2012 Jury Verdicts LEXIS 28986

**Editor's Note:**

On Sept. 16, 2013, the judgment was affirmed on appeal.

Copyright © 2016 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

---

## *Pauline Yip aka Pauline Leung, and Leo Lee v. Bonny Tsang; 2014 Jury Verdicts LEXIS 6612*

KC061553

May 07, 2014

**Headline:** Plaintiffs: Ex-boyfriend Stalked Them and Destroyed Reputations

**Published Date:** August 11, 2014

**Topic:** Intentional Torts - Defamation - Intentional Torts - Intentional Infliction of Emotional Distress - Privacy - Invasion of Privacy

**Injury:** Emotional Distress, Emotional Distress

**Practice Area:** Torts

**State:** California

**Court:** Superior Court of Los Angeles County, Pomona

**Plaintiff Counsel**

John A. Safyurtlu

Firm Name: General Counsel PC

Address: Irvine, CA

Plaintiff Name: (Leo Lee, Pauline Yip)

**Defendant Counsel**

Ralph R. Rios

Firm Name: Rios & Associates

Address: South Pasadena, CA

Defendant Name: (Bonny Tsang)

**Judge:** Dan Thomas Oki

**Case Summary**

In 2011, plaintiff Pauline Yip, an accountant, and plaintiff Leo Lee, the owner of an engineering company that Yip worked at, were allegedly harassed and stalked by Yip's ex-boyfriend, Bony Tsang. They claimed Tsang's actions ruined their professional reputations and invaded their privacy.

Pauline Yip aka Pauline Leung, and Leo Lee v. Bonny Tsang; 2014 Jury Verdicts LEXIS 6612

Yip and Lee sued Tsang for defamation, defamation per se, stalking under the Civil Code, invasion of privacy (intrusion into private affairs, public disclosure of private facts and *false light*), and intentional infliction of emotional distress.

Prior to trial, Yip was granted a restraining order against Tsang. However, prior to the restraining order being served, Tsang accepted a plea bargain, agreeing to a misdemeanor charge of stalking, and served jail time.

Yip worked at Lee's company for several years before her relationship with Tsang ended. She later started dating Lee, though they both decided to keep the existence of their relationship private.  Plaintiffs' counsel asserted that after Yip and Tsang broke up, Tsang made death threats to Yip and her children. Counsel also contended that Tsang broke into Yip's residence while Lee was there and yelled at Yip, calling her derogatory names. Counsel further asserted that Tsang sent numerous emails and posted Facebook messages that graphically detailed sexual activities with Yip and that Tsang threatened to disseminate graphic pictures of him and Yip that he had taken without Yip's knowledge or consent with a camera hidden in his bedroom. In addition, plaintiffs' counsel asserted that Tsang created a new email address to masquerade as Yip, and then went online and found the Web page for Lee's company, which listed the general information email address and sent an email to that address while pretending to be Yip. Counsel contended that Tsang, pretending to be Yip, announced that Yip was now "sleeping with the boss," that Yip knew her "financial future is secure," and that Yip's job was "spreading (her) legs for the boss." Counsel also contended that in Tsang's email where he pretended to be Yip, he stated that Lee "paid for abortions and that Yip had four or five abortions in the past." Plaintiff's counsel noted that Tsang then signed the missive, "Pauline Yip, Accountant/Whore." In addition, plaintiffs' counsel contended that Tsang spoke to the receptionists at both of the company's offices and revealed that Yip and Lee were in a relationship, and claimed that the only reason Yip was receiving a promotion was because of this relationship.

Tsang admitted to everything except the alleged death threats. However, he claimed that he was only revealing the truth that Yip "really was a slut and whore."

**Injury Text:**

Since 2011, both Yip and Lee underwent ongoing couples counseling. They claimed that they feel embarrassment at work because "now people are laughing at them," which is what they wanted to prevent when they originally decided to keep their relationship private.

Thus, Yip and Lee sought recovery of emotional distress damages, as well as recovery of *punitive damages*.

Defense counsel argued that Tsang's actions did not cause any damages to Yip and Lee.

**Trial Length**

5.0 days

**Jury Deliberation**

Pauline Yip aka Pauline Leung, and Leo Lee v. Bonny Tsang; 2014 Jury Verdicts LEXIS 6612

2.0 days

**Jury Composition**

2 male, 10 female; 2 Hispanic, 3 Asian, 1 black, 6 white

**Jury Poll**

12-0 for liability;  9-3 for damages, with 3 holdouts for higher damages

| PLAINTIFF NAME | PROPERTY AWARD |
|---|---|
| Leo Lee | $ 9,500 |
| Pauline Yip | $ 90,000 |

**Plaintiff Amounts:**

(Leo Lee)

   $2,000 Personal Injury: compensatory damages

   $7,500 Personal Injury: *punitive damages*

(Pauline Yip)

   $15,000 Personal Injury: compensatory damages

   $75,000 Personal Injury: *punitive damages*

**Plaintiff Expert(s)**

Susan Pazak, Ph.D.

Address: Laguna Niguel, CA

Specialty: Psychology/Counseling

Affiliation: John Safyurtlu

**Award:** $ 99,500

**Award Details:** The jury found for Yip and Lee on all causes of action. It also found that the plaintiffs' damages totaled $99,500.

*www.verdictsearch.com/index.jsp*

Copyright 2014 ALM Media Properties, LLC.
 All Rights Reserved

Pauline Yip aka Pauline Leung, and Leo Lee v. Bonny Tsang; 2014 Jury Verdicts LEXIS 6612

Further duplication without permission is prohibited

End of Document